UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | ) | |
| JUNE STRUNK, | ) | JURY TRIAL REQUESTED |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-CV 00658 (SRU) |
| | ) | |
| MORGAN STANLEY, MORGAN STANLEY | ) | |
| SMITH BARNEY, LLC, DAVID SWARTZ | ) | |
| | ) | |
| Defendants | ) | May 21, 2018 |
| | ) | |

## FIRST AMENDED COMPLAINT

1.      Plaintiff June Strunk (hereinafter "Plaintiff" or "Strunk") brings this action against Morgan Stanley, Morgan Stanley Smith Barney, LLC and officer, employee and/or agent of Morgan Stanley/Morgan Stanley Smith Barney, LLC, David Swartz (collectively "Defendants") for violations of Connecticut General Statute § 33-1336, the Connecticut corporate whistleblower statute and 18 U.S.C. § 1514A, the Sarbanes-Oxley Act of 2002.  When Plaintiff, a former employee of Morgan Stanley/Morgan Stanley Smith Barney, LLC, under the supervision of David Swartz opposed actions taken by officers, employees and /or agents of Morgan Stanley/Morgan Stanley Smith Barney, in violation of legal and ethical requirements Defendants retaliated against Plaintiff in violation of federal and state laws, 18 U.S.C. § 1514A and Conn. Gen. Stat. § 33-1336.

## II. JURISDICTION

2.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it presents a federal question under 18 U.S.C. § 1514A. This Court has supplemental

1

jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.[1]

3.      Plaintiff has satisfied all procedural and administrative requirements under 18 U.S.C. § 1514A.

4.      Plaintiff previously filed a complaint with the U.S. Department of Labor, OSHA on November 9, 2017. After Plaintiff's complaint had been pending before OSHA for more than 180 days, on May 8, 2018, Plaintiff notified OSHA of her intent to file this action under 18 U.S.C. § 1514A in court since her claims had been pending for more than 180 days and no final decision had been issued.

### III. FACTS

5.      Plaintiff resides in Stonington, Connecticut.

6.      Defendant Morgan Stanley (hereinafter "Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, advises, and originates trades, manages and distributes capital for governments, institutions and individuals.

7.      Morgan Stanley is a financial holding company incorporated in the State of Delaware with its corporate headquarters located at 1585 Broadway, New York, New York 10036.

8.      Defendant Morgan Stanley Smith Barney, LLC (hereinafter "MSSB") is a limited liability company incorporated in the State of Delaware with its corporate headquarters located at 1585 Broadway, New York, New York 10036. MSSB conducts business in its offices nationwide, including in its office in Mystic, Connecticut.

9.      As set forth in Morgan Stanley's 2016 10-K filing with the SEC, MSSB is a subsidiary of Morgan Stanley.

---

[1] This case was originally filed in the State of Connecticut Superior Court on April 6, 2018 and subsequently removed by Defendants on April 19, 2018 based on diversity jurisdiction.

10.     As set forth in Morgan Stanley's 2016 10-K filing with the SEC, MSSB is a "registered broker dealer with the SEC and in all 50 states" and is a member "of various self-regulatory organizations, including the Financial Industry Regulatory Authority, Inc. ("FINRA") and various securities exchanges and clearing organization."

11.     As set forth in Morgan Stanley's 2016 10-K filing with the SEC, "MSSB LLC is also a registered investment adviser with the SEC. MSSB LLC's relationship with its investment advisory clients is subject to the fiduciary and other obligations imposed on investment advisers under the Investment Advisers Act of 1940, and the rules and regulations promulgated thereunder as well as various state securities laws."

12.     At all times relevant to this complaint, Morgan Stanley/MSSB operated a branch located at 5 Fort Rachel Place, Mystic, CT 06355 ("Mystic Branch").

13.     At the time of Plaintiff's termination, Defendant David Swartz was Executive Director and Complex Manager of Morgan Stanley/MSSB. Mr. Swartz's complex included the Mystic, Connecticut office of Morgan Stanley in which Plaintiff was formerly employed.

14.     At all times herein mentioned, Mr. Swartz was an employee, officer and/or agent of Morgan Stanley/MSSB.

15.     At all times herein mentioned, Mr. Swartz transacted business within the State of Connecticut.

16.     Plaintiff was a Financial Advisor and the Resident Manager at the Mystic, Connecticut branch of Morgan Stanley/MSSB.

17.     At all times herein mentioned, Plaintiff was employed by Morgan Stanley/MSSB at their Mystic Branch.

18.     Plaintiff worked for Morgan Stanley/MSSB and predecessor firms from May 1999 until May 16, 2017.

19.     At the time of Plaintiff's termination, her title was Senior Vice President.

***Morgan Stanley/MSSB and the Individual Defendants are subject to Federal Securities Laws***

20.     Morgan Stanley/MSSB are authorized to do business in the State of Connecticut.

21.     Morgan Stanley/MSSB are a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, or that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934.

22.     Morgan Stanley/MSSB are a publicly traded company subject to requirements of the Securities and Exchange Act of 1934 and the Sarbanes Oxley Act.

23.     MSSB is also registered as an investment adviser under the Investment Adviser's Act of 1940, 15 U.S.C. § 80b-1 et seq., and its rules and regulations.

24.     David Swartz, as an officer, employee and/or agent of Morgan Stanley/MSSB is subject to the provisions of Conn. Gen. Stat. § 33-1336, the Securities and Exchange Act of 1934 and the Sarbanes Oxley Act.

25.     Morgan Stanley/MSSB was Plaintiff's employer and is subject to the provisions of Conn. Gen. Stat. §33-1336, the Securities and Exchange Act of 1934 and the Sarbanes Oxley Act.

26.     At all times herein mentioned, the following individuals worked at the Morgan Stanley/MSSB Mystic Branch:

a.   David Volpe was Vice President, Financial Advisor and an employee, officer and/or agent of Morgan Stanley/MSSB.

b.   Robert Patten was First Vice-President, Financial Advisor and an employee, officer and/or agent of Morgan Stanley/MSSB.

c.   Mark Benedict was First Vice President, Financial Advisor at the Mystic

Branch and an employee, officer and/or agent of Morgan Stanley/MSSBC.

27.     At all times herein mentioned, Volpe, Patten, and Benedict were registered investment advisers required to comply with the Investment Adviser's Act of 1940, requiring, among other things,  that investment advisers act as fiduciaries as to their clients; that advisers act in the clients' best interests and with a duty of undivided loyalty to them.

28.     At all times herein mentioned Defendant Swartz was a broker regulated by FINRA (CRD# 4106959). Mr. Swartz holds the following licenses: Series 66, Series 63, Series 3, Series 31, Series 7, Series 10 and Series 9.

29.     At all times herein mentioned Mark Benedict was a broker regulated by FINRA (CRD # 2152143).  Mr. Benedict holds the following licenses: Series 63, 31 and 7.

30.     At all times herein mentioned David Volpe was a broker regulated by FINRA (CRD # 4220889).  Mr. Volpe holds the following licenses: Series 66, 31, 7 and 9.

31.     At all times herein mentioned Robert Patten was a broker regulated by FINRA (CRD # 1436524).  Mr. Patten holds the following licenses: Series 66, 31, 7 and 9.

32.     As investment advisers, Morgan Stanley/MSSB and Mark Benedict, David Volpe, Robert Patten must comply with all applicable SEC's rules and regulations, including but not limited to:

➔ acting in accordance with its fiduciary obligations to its client.  Investment

Advisers Act, § 206.

➔ to act in good faith and in the best interests of the client.  Investment Advisers Act

§ 206.

➔ to obtain "best execution" of the client's transaction; meaning it must execute

securities transactions for clients in such a manner that the clients' total cost or

proceeds in each transaction is the most favorable under the circumstances,

Exchange Act Release No. 23170 (Apr. 23, 1986).

➔ to protect client confidentiality, including preventing the misuse of nonpublic

information. Investment Advisers Act, § 204A, 17 C.F.R. § 275.204-2.

➔ to provide only suitable investment advice. Investment Advisers Act Release No.

1406 (March 16, 1994).

33.     Federal Securities Laws and regulations also require that Defendants comply with

a Code of Ethics and Business Conduct adopted by Morgan Stanley/MSSB. 15 U.S.C. § 7264; 17

C.F.R. § 229.406; 17 C.F.R. § 275-204A-1.

34.     Morgan Stanley/MSSB have adopted corporate governance guidelines, which

includes a Code of Ethics and Business Conduct and a Code of Conduct.

35.      As per Morgan Stanley's 2016 10-K, their "Code of Ethics and Business Conduct

applies to all directors, officers and employees [. . .]".

36.     Morgan Stanley's 2016 10-K states that "Our Code of Conduct (the "Code")

establishes standards for employee conduct that further reinforce the Firm's commitment to

integrity and ethical conduct. Every new hire and every employee annually must certify to their

understanding of and adherence to the Code. The employee annual review process includes

evaluation of adherence to the Code and our core values."

37.     Morgan Stanley/MSSB's Code of Ethics and Business Conduct (updated in July

2017) states that "[a]t Morgan Stanley, we are committed to fostering and maintaining a culture

based on our four core values: Doing the Right Thing, Putting Clients First, Leading with

Exceptional Ideas and Giving Back. Living these values means, above all, conducting ourselves and our business activities in accordance with the letter and spirit of applicable laws and regulations and Firm policies, and acting with integrity to deliver first-class business in a first-class way. As directors, officers and employees, we must protect our reputation by dealing fairly and transparently with clients, the public, competitors, suppliers and each other. We will not take advantage of anyone through manipulation, concealment, improper handling of confidential information, misrepresentation of material facts or other unfair dealing or practices."

38.     Morgan Stanley/MSSB's Code of Ethics and Business Conduct states that "Directors, officers and employees are expected to cooperate in internal investigations of allegations of violations of the Code of Ethics, the Code of Conduct and other policies and procedures.  Violations may subject you to discipline including the cancellation of previously awarded deferred compensation and/or, if applicable, the termination of your employment.  You are personally responsible for any improper or illegal acts you commit during your employment at or service to Morgan Stanley.  You also can be held responsible for the action (or inaction) of others if you knew, or should have known, about their misconduct.  Your activities may be reported to regulators and other governmental authorities, which would result in regulatory or criminal investigations.  Depending on the outcome of those investigations, you may be subject to fines, permanent or partial suspension, disqualification from employment in the financial services industry and/or imprisonment."

39.     Morgan Stanley/MSSB's Code of Ethics and Business Conduct states that "If you are a supervisor, you are responsible for, among other matters, supervising the activities and conduct of the people you manage for compliance with applicable laws, regulations and Firm policies and taking appropriate action when you have concerns.  Supervisors who do not take

appropriate action when reasonable expected to do so may be held responsible for failure to supervise properly and may subject themselves and Morgan Stanley to regulatory and criminal consequences."

40.     Morgan Stanley/MSSB's Code of Ethics and Business Conduct states that "We strive to adhere to the highest standards of ethical conduct. We will not compromise the legal, regulatory or policy requirements that govern our activities. Our commitment to ethical conduct means that we abide not only by the letter, but also by the spirit, of applicable laws and regulations."

41.     Defendants failed to adhere to the standards set forth in the "Code of Ethics and Business Conduct" and "Code of Conduct", such as those concerning, "Legal and Ethical Concerns and Reporting Misconduct", "Putting Clients First", "Consumer Protection Obligations", "Non-Retaliation", and others.

### *Plaintiff's knowledge of Federal Securities Laws*

42.     In 2009, Mrs. Strunk assumed the role of Resident Branch Manager, at Morgan Stanley/MSSB's Mystic Branch.

43.      As Resident Branch Manager, Mrs. Strunk was responsible for informing Complex Management of any suspected illegal or unethical behaviors or actions by Morgan Stanley/MSSB employees, officers and agents in the Mystic Branch.

44.     The "Complex" is the term given to a collection of local offices combined into a larger management group.

45.     Mrs. Strunk had knowledge of the duties and legal and ethical obligations of financial advisors and assistants, including regulatory obligations as a result of her extensive training and experience in the financial advisory field.

46.     During her employment with Morgan Stanley/MSSB, Mrs. Strunk was registered with FINRA.

47.     Throughout her time at Morgan Stanley/MSSB, Mrs. Strunk held Series 7, 31, 63, 65, 9, and 10 licenses.  She completed education and training regarding federal securities laws in order to obtain those licenses  and, participated in continuing education courses related to those laws after obtaining the licenses. She also obtained a license in Certified Financial Planning by the Certified Financial Planner Board of Standards.

48.     During her employment, Mrs. Strunk also understood that Morgan Stanley/MSSB and certain employees of Morgan Stanley/MSSB such as Benedict, Patten and Volpe were registered investment advisers required to comply with the Investment Adviser's Act of 1940, requiring, among other things,  that investment advisers act as fiduciaries as to their clients; that advisers act in the clients' best interests and with a duty of undivided loyalty to them.

49.     Plaintiff understood that Defendants were required to ensure compliance with the Morgan Stanley Code of Ethics and Business Conduct and Code of Conduct.

50.     These sources and her vast experience in the financial services industry informed Mrs. Strunk's decision-making and actions to give effect to these legal, fiduciary and ethical obligations in her role as Resident Branch Manager.

***Mrs. Strunk reports conduct that she believed violated Federal Securities Laws and suffers retaliation***

51.     Plaintiff understood that as Resident Manager she was supposed "Say Something" if she "Saw Something".

52.     Between 2009 through February 2016, Mrs. Strunk consistent with the "See Something, Say Something" culture reported ethical, compliance, and/or legal concerns to

9

Thomas Wright, Branch Compliance Officer, and Catherine Galgano, Complex Manager for the Mystic Branch.

53.     Ms. Galgano addressed Plaintiff's complaints seriously and professionally.

54.     For example, in the 2010-2011 timeframe, Mrs. Strunk noticed questionable behavior by Financial Advisors David Volpe and Robert Tassone related to a sale of A share mutual funds and the repurchase of different A share mutual funds for elderly clients.

55.     The funds were of of low value, which resulted in clients paying maximium commission charges.

56.     Mrs. Strunk was particularly concerned with the transactions because the clients were elderly.  Mrs. Strunk believed that this practice violated federal securities laws because she believed that they violated  fiduciary obligations, the Investment Adviser's Act and the Code of Conduct and the Code of Ethics and Business Conduct.  When Mrs. Strunk brought this irregularity to Ms. Galgano's attention, the matter was addressed so as to correct the conduct.

57.     In the 2012-2013 timeframe, Mark Benedict, was moving client assets so as to maximize his commisions; something he bragged about.

58.     Mr. Benedict did so in a manner that maximized his commissions, disregarding his client's best interests; in violation of his fiduciary obligations.  Again, Mrs. Strunk believed that Mr. Benedict's conduct violated federal securities laws and the Code of Ethics and Business Conduct and the Code of Conduct. Mrs. Strunk reported Mr. Benedict's misconduct to Ms. Galgano and Ms. Galgano addressed it with  Mr. Benedict.

59.     Upon information and belief, in February of 2015, FINRA investigated Benedict for an annuity purchase for an Australian citizen. Ms. Galgano assured Mrs. Strunk that if there was a finding, she would assume responsibility for any actions taken by FINRA.

60.     Ms. Galgano also addressed a report by Mrs. Strunk concerning an administrative assistant in the Mystic Branch. This administrative assistant had an admitted gambling problem. Based on this administrative assistant's behavior and the high incidents of identity fraud for a small branch, Mrs. Strunk had been very concerned over violation of client confidentiality and the possible "selling" of client information by the administrative assistant.

61.     Mrs. Strunk reported this concern to Ms. Galgano.  Mrs. Strunk believed that the administrative assistant's actions could subject clients to potential loss related to identity theft and that the disclosure of private personal and financial information to third parties violated federal securities laws relating to the protection of client confidentiality, the Code of Ethics and Business Conduct and Code of Conduct.

62.     Ms. Galgano recognized the problem and requested that this administrative assistant be removed from her private office and relocated to a desk and workstation on the floor where she could be more closely supervised.

63.     In 2016, Ms. Galgano was replaced by David Swartz as Complex Manager of the Mystic Branch.

64.     Swartz's official position was Executive Director and Complex Manager, and his duties included supervising thirteen different Morgan Stanley/MSSB offices in the Northeastern United States, including the Mystic Branch.

65.     In July 2016, Mrs. Strunk met with Mr. Swartz. Without any basis or specific examples he informed her that financial advisors in the Mystic Branch were complaining about her.  Mrs. Strunk became concerned that Mr. Swartz would not be as receptive and diligent as Ms. Galgano had been to reporting of possible compliance, legal and ethical breaches.

66.     Under Mrs. Strunk's leadership, the Mystic Branch was one of MSSB's most profitable offices. The Mystic Branch's profits were substantial, being over 50% greater than MSSB's average. Over 30% of the branch's revenue was profit, when 20 to 21 percent is MSSB's average. Swartz informed Mrs. Strunk that these numbers were not a "big deal" because Mystic was a small branch. However, during monthly Profit and Loss Reviews with Morgan Stanley/MSSB's corporate office in New York, Mrs. Strunk was consistently told she did a fantastic job because of the Mystic Branch's profits.

67.     In the November-December 2016 time frame, a client of Mark Benedict requested a 401k rollover into an IRA. The client had spent his entire working life at General Dynamics, locally known as Electric Boat.  A significant percent of the rollover was General Dynamics stock. The value of the rollover was close to $1 million dollars. Approximately two weeks after the stock was received into the IRA, Benedict sold 100% of the stock netting $7-8 thousand dollars in commissions. Had Benedict invested the proceeds into a managed account within the following 60 days, the commissions would have been refunded to the client. Benedict deliberately chose, instead, to hold the funds for just over 60 days, to deny the client the benefit of the refund and to retain the commission fee for himself.  Benedict did the same thing with a different client in March, 2017.  Based on Mrs. Strunk's trading and experience she knew that if the General Dynamics stock was to be sold, the stock could have and should have been sold at the time of the rollover at no cost to the client.

68.     In early 2017, Benedict liquidated an annuity in a client's non-qualified account and then purchased an annuity in the same client's qualified account. The liquidation and subsequent purchase of an annuity was not precleared through the insurance review unit. It was determined that this action needed advance clearance by the insurance review unit.

69.     Once again, Mrs. Strunk believed that Mr. Benedict's conduct violated the Code of Ethics and Business Conduct, and the Code of Conduct and federal securities law.  Mrs. Strunk reported Mr. Benedict's suspected illegal and unethical conduct to Gorsan Semsettin who, upon information and belief, in turn reported it to Mr. Swartz. Mr. Swartz told Mrs. Strunk that he had told Benedict that Strunk had reported his misconduct.

70.     In February of 2017, the administrative assistant that had been moved by Ms. Galgano was witnessed taking a picture of a client's investment holdings on her personal cell phone.

71.     Upon information and belief,  David Volpe had asked this administrative assistant to take the picture of the computer screen and send it to him via text message, which she did. During the same time period,  this administrative assistant was also witnessed logging onto David Volpe's work station using David Volpe's login ID and password. She was not an adviser yet she was logging into client accounts as an adviser. Mrs. Strunk believed these actions were serious violations of client confidentiality interests and the Company's internal controls. Mrs. Strunk reported these actions to Celeste Hamler, the Complex Service Manager, who, upon information and belief, in turn, reported them to Mr. Swartz. Mr. Swartz told Mrs. Strunk that he had informed Mr. Volpe that it had been Strunk who reported his misconduct. Despite the fact that the administrative assistance was on final warning, Mr. Swartz took no disciplinary action against her nor did she receive any letter of education.  Upon information and belief, no action was taken against Mr. Volpe.

72.     After Mrs. Strunk reported the latest round of ethical and illegal misconduct by Mr. Benedict, Mr. Volpe and the administrative assistant, Mrs. Strunk found herself in the crosshairs of an escalating harassment campaign. With the arrival of Mr. Swartz, the financial

advisors knew that Mrs. Strunk no longer had the protection of Catherine Galgano; they "punished" her accordingly and with impunity for reporting their misconduct.

73.     By way of example,

a.      During the time after Mr. Swartz arrived up to the time of Mrs. Strunk's discharge, when she would walk out of her office, and other advisers who were gathered around talking, saw her, they immediately ceased conversation, disbursed and walked away "shunning" her.

b.      After Mr. Swartz arrived up to the time of Mrs. Strunk's discharge, financial advisors would bypass Mrs. Strunk and call Mr. Swartz directly for favors, questions and concerns. Mr. Swartz did not relay these communications to Mrs. Strunk and did not encourage the advisors to deal with Mrs. Strunk directly, thus undermining her authority at the branch, the branch's administrative structure and function and condoning their behavior.

c.      Mrs. Strunk was intentionally left out of communications between David Swartz and financial advisors in the Mystic Branch, thus undermining her authority at the branch, the branch's administrative structure and function, and condoning their behavior.

d.      For several years, Mrs. Strunk had received a bonus during the month of February for a positive profit and loss for the branch. Ms. Galgano had allocated this bonus to Mrs. Strunk in past years. In 2017, under Mr. Swartz's leadership, Mrs. Strunk was not awarded a bonus, even after inquiring about it.

e.      In 2014 and 2015, Mrs. Strunk had been invited to the prestigious Barron's Women's Financial Advisor Summit, held in Palm Springs, Florida in

14

December.  In 2016, with David Swartz as her manager, she was not invited despite making known to Mr. Swartz her desire to attend. Mrs. Strunk asked Mr. Swartz if she would get invited and Swartz never responded.

f.      In winter of 2016-2017, Mrs. Strunk caught Robert Patten sending his golf clubs to California using MSSB to pay for the cost of sending his clubs. Mrs. Strunk reported this behavior to Celeste Hamler who, upon information and belief, notified Compliance.  Mr. Patten became very angry with Mrs. Strunk shunning her for weeks.  Mr. Patten continued shunning Mrs. Strunk despite requests by Mrs. Strunk to stop.

***Mrs. Strunk complains to Human Resources about the harassment***

74.    Exasperated by the increasingly hostile work environment that she was being subjected to, Mrs. Strunk complained to Morgan Stanley/MSSB's Human Resources Department based out of Purchase, New York. A couple of weeks later, Human Resources responded to Mrs. Strunk noting that there were "characters at the Mystic branch", and that Mrs. Strunk simply had to learn to live with the harassment.

75.    On April 13, 2017, David Swartz and Bernie Duque visited the Mystic Branch. Bernie Duque would be assuming the role of Branch Intermediary to the Complex Manager (David Swartz).

76.    During their visit, they met with Mrs. Strunk to discuss Branch operations, including her various complaints of ethical and legal violations. When Mrs. Strunk discussed the unethical and improper and illegal practices carried on  by Mark Benedict, Mr. Swartz responded with a simple statement that the client had not complained. Mrs. Strunk  pointed out that the retiree client did not know to complain and then asked Mr. Swartz whether he would take responsibility

if one of Benedict's or Volpe's actions blew up.  Swartz replied that  he would not and that it would be her problem as the "9/10 on site".

77.     This put Mrs. Strunk in the impossible position of bearing witness to ethical and legal violations, not being given any authority or support from Defendants to remedy or address the issues, all the while putting her licenses and professional reputation at risk.

78.     On May 16, 2017, Mrs. Strunk left Morgan Stanley/MSSB. She was forced to resign and, thus, constructively discharged from her position by reason of the harassment and retaliation she was suffering from Defendants.

79.     Morgan Stanley/MSSB's retaliatory conduct did not end with Mrs. Strunk's departure from its employ.

*Post-Termination Retaliation*

80.     After leaving Morgan Stanley/MSSB, Mrs. Strunk joined Janney Montgomery Scott LLC.  She had longstanding relationships with many of her clients and a legitimate expectation that those relationships would continue into the future.

81.     For a long period of time, Morgan Stanley/MSSB had been a party to the Protocol for Broker Recruiting (hereinafter "the Protocol") that governed the transfer of individual investment advisers from one such company to another.

82.     The Protocol permitted individual investment advisers, like Mrs. Strunk, to take much, if not all, of their business with them when they moved to another company, even if they had earlier signed a form of non-compete or non-solicitation agreement with the employer which they were leaving. So long as the individual investment adviser observed the terms of the Protocol, she was free to go and to do so without giving up her book of business.

83.     When Mrs. Strunk left due to the harassment and retaliation, the Protocol was ignored by Morgan Stanley/MSSB.

84.     At Mrs. Strunk's departure, Morgan Stanley/MSSB set out to strip her of her client accounts and to punish her for complaining of her fellow advisers' misfeasance.

85.     Morgan Stanley/MSSB moved to enforce Mrs. Strunk's non-solicitation agreement and filed a FINRA arbitration claim against her to accomplish this purpose.

86.     Morgan Stanley/MSSB went so far as to seek a Temporary Restraining Order in federal court to prevent Mrs. Strunk from transitioning her clients to Janney. Finally, the Company undertook a campaign to disparage and defame Mrs. Strunk, in order to destroy her client goodwill and her business reputation.

87.     Upon information and belief, before Mrs. Strunk left Morgan Stanley/MSSB had not taken similar actions against other former Morgan Stanley/MSSB employees who left in similar circumstances as Mrs. Strunk.

### IV. CAUSES OF ACTION

<u>**COUNT ONE:**</u>   **VIOLATION OF CONN. GEN. STAT. §33-1336**

1- 83.  Plaintiff incorporates ¶¶ 5-87 of section III. as if set forth fully in Count One.

84.     Through her reporting and opposition to the above mentioned activities and her refusal to participate in these activities, Mrs. Strunk had engaged in conduct protected by the whistleblower provisions of Conn. Gen. Stat. § 33-1336.

85.     Mrs. Strunk performed her employment duties in the State of Connecticut.

86.     Based on the foregoing, Defendants illegally retaliated against Plaintiff because she engaged in activity protected by Conn. Gen. Stat. § 33-1336.

87.     Plaintiff provided information, caused information to be provided, or otherwise assisted in an investigation regarding conduct which she reasonably believed constituted a

violation of a law, rule or regulation of the Securities and Exchange Commission or any provision of federal of state law relating to fraud, and provided such information or assistance to persons employed by Morgan Stanley/MSSB with supervisory authority over Mrs. Strunk and persons employed by Morgan Stanley/MSSB who had the authority, indeed the obligation,  to investigate, to discover, or to terminate the very misconduct.

88.     Defendants had knowledge of Mrs. Strunk's protected conduct, and subjected her to retaliation, including but not limited to harassment, constructive discharge, and post discharge retaliatory actions.

89.     Defendants had knowledge of Plaintiff's protected conduct and constructively discharged and discriminated against her in the terms and conditions of her employment because she engaged in the aforementioned protected conduct.

90.     Defendants' actions have caused Plaintiff to suffer damages, including, but not limited to, compensatory damages, economic damages, loss of employment benefits, and damage to reputation, emotional and physical distress, and loss of enjoyment of life.

91.     Plaintiff has also incurred, and will continue to incur, attorney's fees and costs.

## COUNT TWO:  VIOLATION OF SARBANES-OXLEY ACT, 18 U.S.C. § 1514A

1- 83.     Plaintiff incorporates ¶¶ 5-87 of section III as if set forth fully in Count Two.

84.      Based on the foregoing, Defendants illegally retaliated against Plaintiff for her protected conduct in violation of 18 U.S.C. § 1514A.

85.     Plaintiff provided information, caused information to be provided, or otherwise assisted in an investigation, regarding conduct which she reasonably believed constituted a violation of a law, rule or regulation of the Securities and Exchange Commission or of federal  or state law relating to fraud, and provided such information or assistance to persons employed by

Morgan Stanley/MSSB with supervisory authority over Mrs. Strunk and persons employed by Morgan Stanley/MSSB who had the authority, indeed the obligation,  to investigate, to discover, or to terminate  that very misconduct.

86.    Defendants had knowledge of Mrs. Strunk's protected conduct, and subjected her to retaliation, including but not limited to harassment, constructive discharge, and post discharge retaliatory actions.

87.    Defendants had knowledge of Plaintiff's protected conduct and constructively discharged and discriminated against her in the terms and conditions of her employment because she engaged in the aforementioned protected conduct.

88.    Defendants' actions have caused Plaintiff to suffer damages, including, but not limited to, compensatory damages, economic damages, loss of employment benefits, and damage to reputation, emotional and physical distress, and loss of enjoyment of life.

89.    Plaintiff has also incurred, and will continue to incur, attorney's fees and costs.

**V. REQUEST FOR RELIEF**

WHEREFORE, Plaintiff claims judgment against Defendants and compensatory damages, punitive damages, attorneys' fees and costs; prejudgment interest; post judgment interest; and such other relief in equity or law that may pertain.

**VI. JURY DEMAND**

PLAINTIFF REQUESTS A TRIAL BY JURY.

Done at Stratford, Connecticut this 14th of May, 2018.


MITCHELL & SHEAHAN, P.C.


By:     */s/Robert B. Mitchell*
        Robert B. Mitchell (ct02662)
        Maria Garcia-Quintner (ct27568)
        80 Ferry Boulevard, Suite 216
        Stratford, CT 06615
        Tel.: (203) 873-0240
        Fax: (203) 873-0235
        Email: mgarcia@mitchellandsheahan.com
        *Attorneys for Plaintiff*

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that on May 21, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Maria Garcia-Quintner*
Maria Garcia-Quintner